UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| CORVETTE MCCAMPBELL, | |
| Plaintiff, | |
| v. | CAUSE NO. 3:21-CV-152-RLM-MGG |
| KIM MYERS, et al., | |
| Defendants. | |

OPINION AND ORDER

Corvette McCampbell, a prisoner proceeding without a lawyer, was granted leave to proceed against Nurse Practitioner Kim Myers, Health Services Administrator Lee Ann Ivers, and Dr. Noe Marandet for failing to provide him with constitutionally adequate medical care. The dendants move for summary judgment, arguing that they were not deliberately indifferent to Mr. McCampbell's medical needs. He has responded to the motion, and defendants have replied. The matter is now ripe for adjudication.

I. FACTS

The following facts are undisputed unless otherwise noted. Mr. McCampbell is 44 years old and has several chronic conditions including obesity, gout, hyperlipidemia, anemia, and hypertension. He has been in the custody of Indiana Department of Correction since 2016, and was incarcerated at Miami Correctional Facility from May 2016 to January 2019 and again from March to November 2020.

He first noticed a problem with his eyes in 2017. Based on his complaints, a nurse referred him to the optometrist at Miami Correctional Facility (a non-party), who he saw on July 25, 2017, and September 12, 2017. The optometrist conducted an eye exam, but expressed concerns that the problem might not be with his eyes.

On September 13, 2017, Nurse Practitioner Myers saw Mr. McCampbell for a chronic care visit. During her physical examination, she noted some swelling and redness to Mr. McCampbell's eye, and he reported to her that he was seeing double and having headaches. He told her he had already seen the optometrist about these issues. She prescribed him a steroid with anti-viral medication called Acyclovir, a combination anti-bacterial and steroidal eye drop called Maxitrol, and a short-term prescription for Prednisone, another steroid medication.[1] She also prescribed Excedrin Migraine for headaches and renewed his medications for his chronic conditions. In Nurse Practitioner Myers' professional opinion, the long-term use of steroids, particularly at a high dosage, comes with "significant side effects and risks." Her goal is to prescribe the medication at a sufficient level to address the patient's symptoms, without exposing the patient to undue risks and side effects.

Mr. McCampbell filed another health care request complaining about his eyes in late September 2017. He saw the optometrist twice in October 2017, but the optometrist ultimately concluded that "the problem [was] not related to [his] eyes"

---

[1] *See* PHYSICIAN'S DESK REFERENCE, Maxitrol, https://www.pdr.net/drug-summary/Maxitrol-Ophthalmic-dexamethasone-neomycin-sulfate-polymyxin-B-sulfate-1099 ; PHYSICIAN'S DESK REFERENCE, Acyclovir, https://www.pdr.net/drug-summary/Acyclovir-acyclovir-sodium-670.3105 ; PHYSICIAN'S DESK REFERENCE, Prednisone, https://www.pdr.net/drug-summary/Prednisone-Tablets-prednisone-3516.6194

2

and that a computed tomography (CT) scan might be needed to "rule out [the] source of pain."

On October 19, 2017, Mr. McCampbell returned to see Nurse Practitioner Myers. He reported ongoing headaches and blurred and double vision. Upon examining him, Nurse Practitioner Myers was concerned about sinus congestion,[2] and so she prescribed the allergy medication Singulair as well as Bactrim, an antibiotic, to address any potential infection.[3] She noted that he had drainage from one eye and that during the examination he kept "squeezing" the inner part of his eye with his fingers, which she asked him to try not to do. She scheduled him for a follow-up visit and indicated in her notes that she would refer him for imaging if his symptoms did not improve.

---

[2] Mr. McCampbell disputes that he ever complained about sinus congestion, but the medical records indicate that this was the nurse practitioner's assessment based on her own examination and evaluation of his symptoms. Mr. McCampbell disputes several of the defendants' proposed facts without including "a citation to evidence supporting each dispute of fact." N.D. IND. L. R. 56-1(b)(2)(C). Even though he is proceeding without counsel, he is required to comply with applicable summary judgment procedures. McCurry v. Kenco Logistics Servs., LLC, 942 F.3d 783, 787 (7th Cir. 2019). In some instances, he seems to simply disagree with the wording of the proposed fact. For example, in response to Defendants' proposed fact: "Plaintiff does not recall any specific face-to-face interaction with Defendant Ivers," he states: "Disputed. Mr. McCampbell recalls he had no face to face time with Ms. Ivers." In other words, it is undisputed that he never met with Health Services Administrator Ivers in person. In other instances, he does not expressly dispute that he was given a particular form of treatment on a particular date, but argues that the treatment he was given was "non-meaningful." Legal arguments about whether he received constitutionally adequate care do not create a dispute of fact. In still other instances, his response does not appear to match up with the proposed fact stated by the defendants. For these reasons, the court deems the following of the defendants' proposed facts admitted, notwithstanding an objection by Mr. McCampbell: No. 2, 25, 26, 32, 33, 34, 43, 44, 45, 46, 49, 50, 55, and 57.

[3] See PHYSICIAN'S DESK REFERENCE, Singulair, https://www.pdr.net/drug-summary/Singulair-montelukast-sodium-390.6179; PHYSICIAN'S DESK REFERENCE, Bactrim, https://www.pdr.net/drug-summary/Bactrim-Bactrim-DS-sulfamethoxazole-trimethoprim-686.4372.

3

Nurse Practitioner Myers saw Mr. McCampbell again on November 17, 2017 and he continued to complain of eye pain and headaches with blurred, double vision. She submitted a request for him to receive a CT scan of the head. He underwent a CT scan at an outside medical facility on November 30, 2017. The radiologist interpreting the CT scan didn't find evidence of a tumor, collection of fluid, or other abnormality.

On December 1, 2017, Mr. McCampbell was assessed by a nurse during sick call complaining of increased eye pain and drooping in his right eyelid. The nurse contacted Nurse Practitioner Myers, who ordered Prednisone for 10 days and instructed that he be scheduled to see her. Nurse Practitioner Myers saw Mr. McCampbell on January 10, 2018, and she told him that the results of his CT scan were normal. He again reported eye pain and ongoing headaches as well as difficulty sleeping. In her assessment, he "look[ed] like hell" at this visit from pain and lack of sleep, and so she gave him an immediate injection of Toradol, a pain medication. She also ordered laboratory tests and prescribed Pamelor to address his complaints of pain as well as to help him sleep. She continued his prescriptions of Excedrin Migraine and Prednisone.

Nurse Practitioner Myers next saw Mr. McCampbell on March 8, 2018, for a chronic care visit.[4] They discussed the status of his health conditions and his headaches. She continued his prescription of Pamelor and Excedrin Migraine and also ordered another 10 days of Prednisone. She noted that his recent laboratory tests

---

[4] In the interim, Mr. McCampbell states that he saw a nurse (a non-party) who discussed with him the need to lower the salt intake in his diet and lose weight.

4

were unremarkable and again noted that the CT scan was normal. She directed that he have a follow-up visit with the eye doctor. A week later, Mr. McCampbell saw the optometrist, who noted ongoing swelling and redness to the eye. The optometrist recommended that he continue Prednisone and use cool compresses on the affected area.

Nurse Practitioner Myers saw Mr. McCampbell on May 16, 2018 after he submitted a healthcare request reporting that he could not feel one side of his face. Nursing staff noted that his face appeared flaccid. Nurse Practitioner Myers renewed the prescription for Prednisone and the antiviral medication Acyclovir for another 30 days. She opined that his symptoms were consistent with Bell's Palsy.[5] After that visit, Nurse Practitioner Myers didn't see Mr. McCampbell again for more than two years.

Mr. McCampbell put in another health care request on June 24, 2018. Dr. Marandet saw him the next day and reported swelling of his eyelids. The doctor noted swelling and redness in both eyes. His opinion was that Mr. McCampbell had conjunctivitis and sinus issues.[6] He prescribed Maxitrol eyedrops and the allergy medication Zyrtec and told him to follow up in 30 days. The following day, Mr. McCampbell saw the prison optometrist, who recommended that he start Prednisone

---

[5] "Bell's palsy is a form of temporary facial paralysis resulting from damage or trauma to the facial nerves." Ricketts v. Wisconsin Secure Health Serv. Unit, No. 19-CV-491-WMC, 2022 WL 136800, at *1 n.2 (W.D. Wis. Jan. 14, 2022) (citation omitted).

[6] Conjunctivitis, also called pink eye, "refers to a reddening of the white part of the eye and has several possible causes, most commonly viruses, bacteria, or allergens." Pratt v. Tchaptichet, No. 3:21-CV-360-DRL-MGG, 2021 WL 5759132, at *1 n.1 (N.D. Ind. Dec. 3, 2021) (citation omitted).

again as well as continuing to use cool compresses to the eye. The optometrist also prescribed him eye drops.

On August 15, 2018, Mr. McCampbell had a chronic care visit with Dr. Marandet. He again reported experiencing painful headaches. The doctor noted that Mr. McCampbell had uncontrolled obesity, which Dr. Marandet felt was contributing to his health problems.[7] Dr. Marandet counseled him on increasing his physical activity and following a low-sodium diet. The doctor also noted some swelling and redness to both eyes, and his opinion was that it was another flare-up of conjunctivitis coupled with sinusitis. Mr. McCampbell claims that Dr. Marandet told him at this visit, "Everything is perfectly normal." (ECF 54-3 ¶ 26.) It's undisputed that the doctor prescribed another five days of oral Prednisone as well as Prednisone eyedrops, Excedrin Migraine, Zyrtec, Pamelor, and other medications for his chronic conditions at that visit. Dr. Marandet also ordered facial x-rays at this visit, which were performed the following day and were found to be normal.

On September 25, 2018, Mr. McCampbell saw the prison optometrist, who prescribed Maxitrol eyedrops to be used for 10 days. Mr. McCampbell attests that the optometrist told him at that visit there was "nothing he can do for [him]." (ECF 54-3 ¶ 29.) Mr. McCampbell put in additional health care requests on October 10, October 25, and November 5. On November 13, 2018, Dr. Carl Kuenzli (a non-party) saw Mr. McCampbell and prescribed him antibiotics and also continued the Maxitrol eye

---

[7] At that visit, it was noted that Mr. McCampbell was 6 feet tall and 312 pounds.

drops. Dr. Kuenzli also ordered additional x-rays, which were performed a few days later and returned as normal.

On November 15, 2018, Mr. McCampbell filed a grievance about his medical care. The grievance was forwarded to Health Services Administrator Ivers for her input. Health Services Administrator Ivers is a registered nurse, but her job duties at that time were primarily administrative: to supervise the provision of medical services at the Miami County facility, ensure compliance with Department of Correction directives, and respond to requests for information from Department of Correction staff. She didn't have authority to overrule or change a treatment decision made by a medical professional. Instead, if a prisoner complained about a medical issue, her job was to ensure that he had access to the appropriate medical provider. When Mr. McCampbell's grievance was forwarded to her, she reviewed his medical records and saw that he had been seen numerous times for headaches and eye issues, including as recently as November 13, 2018. Nevertheless, given the concerns he outlined in his grievance, she directed that he be scheduled to see a doctor. He had a follow-up visit with Dr. Kuenzli on December 10, 2018.[8]

A few days after this visit, Dr. Kuenzli submitted a request for Mr. McCampbell to undergo an MRI, which was performed on January 3, 2019. The MRI revealed an "extensive bilateral orbital pseudotumor." A pseudotumor, sometimes called a "false tumor," is not cancerous and is often caused by a collection of fluid in

---

[8] Mr. McCampbell attests that Dr. Kuenzli "refused [him] treatment" at the December 10 visit, but it is undisputed that Dr. Kuenzli requested approval for an MRI shortly after this visit, which was performed approximately three weeks later. (ECF 51-6 at 55.)

7

the brain.[9] There is no specific treatment for a pseudotumor, and most patients are treated with medication to help relieve the symptoms and pressure caused by the tumor, including steroids, medications for headaches, and in some cases diuretics. Prednisone is a standard treatment for a pseudotumor. After the results of the MRI were obtained, Dr. Kuenzli ordered a second MRI, which was performed and returned with a concern for cancer. Dr. Kuenzli's plan was to order laboratory testing and further imaging, and to obtain a consultation with a neurosurgeon or oncologist if necessary.

Those steps weren't taken because Mr. McCampbell was discharged from the custody of the Department of Correction on January 24, 2019 and didn't return for more than a year. After his release from Department of Correction, he was initially held at a jail in Dearborn County, Indiana, while he pursued post-conviction relief related to his criminal conviction. On his counsel's motion, he was released on his own recognizance in April 2019 so that he could return home to Chicago to receive needed medical care. During his release, Mr. McCampbell was seen and evaluated by a neurologist, ophthalmologist, and other specialists at Cook County Hospital in Chicago. He was admitted to the hospital on April 29, 2019, after presenting to the emergency room with headaches and blurry vision in both eyes. An MRI revealed a large mass or tumor behind his eyes. He then underwent a biopsy, which showed that

---

[9] A pseudotumor is a "relatively uncommon neurological condition . . . marked by moderately severe headaches associated with papilledema on physical examination. Imaging studies do not reveal a mass lesion in the brain." TABER'S MEDICAL DICTIONARY, Pseudotumor, https://www.tabers.com/tabersonline/view/Tabers-Dictionary/761136/all/pseudotumor?q=pseudotumor.

8

the mass was not cancerous. A pathology report described the condition as "idiopathic orbital inflammation."[10] (*Id.*) A neurologist who treated him noted that a "pseudotumor extending outside [the] orbits is very rare." (*Id.* at 41.) Mr. McCampbell was discharged from Cook County Hospital on May 3, 2019, with a prescription for Prednisone and Maxitrol eyedrops.

At that point, Mr. McCampbell returned to the Dearborn County jail. In March 2020, after proceedings on his post-conviction petition concluded, he returned to Miami Correctional Facility. When he arrived at the prison, the Cook County Hospital discharge summary was added to his prison medical records and medical staff noted at intake that he was taking Prednisone in addition to other medications.

Nurse Practitioner Myers saw Mr. McCampbell on July 1, 2020, for a chronic care visit at which they discussed his conditions, including the tumor. Mr. McCampbell told her about the care he had received in Chicago, and she continued him on a number of medications, including Prednisone. She last saw Mr. McCampbell in August 2020, when he was in the prison infirmary being treated for gout.[11] He was discharged from the infirmary on August 31, 2020, by Dr. Marandet, who ordered that he continue a number of medications, including Prednisone.

---

[10] The term "idiopathic" is used to describe "an illness of uncertain or undetermined cause." TABER'S MEDICAL DICTIONARY, Idiopathic, https://www.tabers.com/tabersonline/view/Tabers-Dictionary/743477/0/idiopathic?q=idiopathic

[11] Mr. McCampbell disputes the circumstances surrounding how he contracted gout and the treatment he received for this condition, but this dispute isn't material to whether he received constitutionally adequate treatment for the eye issues. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

9

Mr. McCampbell was transferred to Plainfield Correctional Facility in November 2020. As of the date of his deposition in December 2021, he was still taking Prednisone. He testified that due to the progression of the tumor, he had no vision in his right eye and the vision in his left eye was "kind of blurry."

## II.  ANALYSIS

A court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Daugherty v. Page, 906 F.3d 606, 610 (7th Cir. 2018). In deciding whether a genuine dispute of fact exists, the court must "consider all of the evidence in the record in the light most favorable to the non-moving party, and . . . draw all reasonable inferences from that evidence in favor of the party opposing summary judgment." Dunn v. Menard, Inc., 880 F.3d 899, 905 (7th Cir. 2018) (citation omitted).

A party opposing a properly supported summary judgment motion can't rely only on allegations or denials in her own pleading, but rather must "present the court with the evidence she contends will prove her case." Goodman v. Nat'l Sec. Agency, Inc., 621 F.3d 651, 654 (7th Cir. 2010). "[I]nferences relying on mere speculation or conjecture will not suffice." Trade Fin. Partners, LLC v. AAR Corp., 573 F.3d 401, 407 (7th Cir. 2009). Not every dispute between the parties makes summary judgment inappropriate; "[o]nly disputes over facts that might affect the outcome of the suit

under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). At the summary judgment stage, the court cannot "weigh conflicting evidence" or "make credibility determinations," as this is "the province of the jury." Omnicare, Inc. v. UnitedHealth Grp., Inc., 629 F.3d 697, 704-05 (7th Cir. 2011) (citations omitted). The court's only function is "to determine whether there is a genuine issue for trial." Tolan v. Cotton, 572 U.S. 650, 657 (2014).

Under the Eighth Amendment, inmates are entitled to adequate medical care. Thomas v. Blackard, 2 F.4th 716, 722 (7th Cir. 2021) (citation omitted). However, they are "not entitled to demand specific care," Walker v. Wexford Health Sources, Inc., 940 F.3d 954, 965 (7th Cir. 2019), nor are they entitled to "the best care possible." Forbes v. Edgar, 112 F.3d 262, 267 (7th Cir. 1997). Rather, they are entitled to "reasonable measures to meet a substantial risk of serious harm." Id. "[M]ere disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." Lockett v. Bonson, 937 F.3d 1016, 1024 (7th Cir. 2019) (citation and internal quotation marks omitted). Courts will "defer to medical professionals' treatment decisions unless there is evidence that no minimally competent professional would have so responded under those circumstances." Walker v. Wexford Health, 940 F.3d at 965 (citation and quotation marks omitted). This standard "reflects the reality that there is no single 'proper' way to practice medicine in a prison, but rather a range of acceptable courses based on prevailing standards in

11

the field." Lockett v. Bonson, 937 F.3d at 1023 (citation and internal quotation marks omitted).

It's not enough that a medical professional be mistaken in his or her judgment. "[N]egligence, gross negligence, or even recklessness as the term is used in tort cases is not enough" to establish an Eighth Amendment violation. Hildreth v. Butler, 960 F.3d 420, 425–426 (7th Cir. 2020). The inmate must show deliberate indifference, which is "a culpability standard akin to criminal recklessness." Thomas v. Blackard, 2 F.4th at 722. The plaintiff must show that the doctor's treatment decisions were "blatantly inappropriate." Pyles v. Fahim, 771 F.3d 403, 409 (7th Cir. 2014). "The federal courts will not interfere with a doctor's decision to pursue a particular course of treatment unless that decision represents so significant a departure from accepted professional standards or practices that it calls into question whether the doctor actually was exercising his professional judgment." *Id.*

Mr. McCampbell meets the first prong of the inquiry: he had a serious, debilitating disease of an unknown origin that affected his sight. On the second prong, while the loss of his vision is tragic, no reasonable jury could conclude that the defendants were deliberately indifferent to his need for medical care, or that they made treatment decisions that were blatantly inappropriate in light of the information known to them.

The only role Health Services Administrator Ivers played in these events was to review Mr. McCampbell's November 2018 grievance and a January 2019 request for medical care. In response to his grievance, she reviewed his medical records and

noted that he had been seen multiple times by medical providers for his headaches and eye problems, including as recently as two days earlier. She scheduled him to see the doctor again. Five days later, Dr. Kuenzli saw him and ordered another MRI. In connection with the January 2019 heath care request, Health Services Administrator Ivers scheduled Mr. McCampbell to see the doctor. Dr. Kuenzli developed a treatment plan after the second MRI, but it couldn't be carried out because Mr. McCampbell was discharged from Department of Correction custody a short time later.

Mr. McCampbell complains that Health Services Administrator Ivers misdiagnosed him as having a pseudotumor. The record shows Health Services Administrator Ivers did not diagnose him with any medical condition, nor did she have the authority to do so. She simply noted in response to his grievance appeal that the MRI, as interpreted by a radiologist at an outside facility, showed the presence of a pseudotumor. (ECF 51-7 at 5; *see also* ECF 51-6 at 55 (radiology report noting a "[m]arked, extensive bilateral orbital pseudotumor".) No reasonable jury could conclude that Health Services Administrator Ivers committed an Eighth Amendment violation. *See* Brown v. Osmundson, 38 F.4th 545, 553 (7th Cir. 2022) (no liability for prison nurse who "wrote down [the plaintiff's] symptoms, checked his vitals, relayed necessary information to [the doctor], and performed her assigned duties.").

Turning to Dr. Marandet, the record reflects that he saw Mr. McCampbell a total of two times: once in June 2018 and again in August 2018. By the time Dr. Marandet saw him, Mr. McCampbell had been seen and assessed by numerous medical providers for headaches and eye problems, and had also undergone a CT scan

13

that revealed no abnormalities. Dr. Marandet examined him and concluded, based on his medical judgment, that Mr. McCampbell was suffering from conjunctivitis and sinusitis. He prescribed a number of medications, including Pamelor and Excedrin Migraine for pain, and also counseled Mr. McCampbell on trying to increase his physical activity and follow a healthy diet, as he believed that Mr. McCampbell's obesity was contributing to his overall poor health. Although Dr. Marandet didn't know at that time that Mr. McCampbell had a pseudotumor, he also prescribed Prednisone to address his eye swelling, which is a standard treatment for a pseudotumor. It is the same medication the specialists at Cook County Hospital gave him after his extensive work-up there. No reasonable jury could conclude that Dr. Marandet was deliberately indifferent to Mr. McCampbell's medical needs. Walker v. Wexford Health, 940 F.3d at 965.

That leaves Nurse Practitioner Myers. The record reflects that she saw him multiple times to assess the cause of his headaches and eye problems. She tried a number of different medications to address his symptoms, including pain medications, antibiotics, antiviral medications, and Prednisone. This included giving him an immediate shot of a strong pain killer when he appeared to her to be in distress. When Mr. McCampbell's symptoms didn't improve over a period of months, she ordered laboratory tests and referred him for a CT scan. The results were unremarkable. She later diagnosed him with Bell's Palsy, which it turns out may not

have been an accurate diagnosis.[12] Merely being mistaken in one's medical judgment isn't enough to establish deliberate indifference. Hildreth v. Butler, 960 F.3d at 425–426. Based on the steps that Nurse Practitioner Myers took to diagnose and treat Mr. McCampbell, no reasonable jury could conclude that she acted in a manner that was so significant a departure from accepted professional standards as to call into question whether she was actually exercising her professional judgment. *See* Pyles v. Fahim, 771 F.3d at 409.

Additionally, though Nurse Practitioner Myers was unaware at that time that Mr. McCampbell had a pseudotumor, she prescribed him Prednisone, which is a common treatment for a pseudotumor, several times during this period. She didn't give him a blanket order for Prednisone to be taken indefinitely, but she has explained that this is because in her medical opinion high doses of steroids over a long period can cause serious complications and side effects. Her desire to closely monitor Mr. McCampbell's need for Prednisone to minimize potential complications suggests a concern for his well-being, rather than deliberate indifference. When Mr. McCampbell returned to the Miami County facility with a confirmed diagnosis, she continued him on Prednisone, the same medication the specialists at Cook County Hospital had given him, and the same medication he was taking at the time of his deposition.

---

[12] A specialist at Cook County Hospital didn't discount that he might have had an episode of Bell's Palsy, but opined that this was unrelated to the tumor.

Mr. McCampbell believes Nurse Practitioner Myers violated his Eighth Amendment rights because she "gave [him] many medications, none of which helped his serious medication condition." (ECF 54-2 at 10.) Because Mr. McCampbell is the non-movant, the court must construe all facts and draws all reasonable inferences in his favor, but his dissatisfaction with her treatment decisions doesn't prove deliberate indifference. *See* Lloyd v. Moats, 721 F. App'x 490, 494–495 (7th Cir. 2017); *see also* Andrews v. Hanks, 50 F. App'x 766, 768-769 (7th Cir. 2002) ("[Plaintiff's] recovery was indeed slow, but while [he] may not view the care he received as sufficiently aggressive ... his disagreement with medical providers does not demonstrate deliberate indifference.").

Mr. McCampbell believes that an MRI should have been ordered sooner, but he doesn't have the experience or training to offer an opinion on when additional diagnostic testing was medically warranted. Lloyd v. Moats, 721 F. App'x at 494–495. Additionally, Nurse Practitioner Myers wasn't responsible for Mr. McCampbell's care between May 2018 and July 2020, and by the time she saw him again in July 2020, he had already undergone multiple MRIs and received his diagnosis. Mr. McCampbell also appears to believe that the Prednisone Nurse Practitioner Myers prescribed him made the tumor worse, but again he doesn't have the training or experience required to offer a medical opinion on this issue. *See id.* This assertion also doesn't square with the evidence in the record. After Mr. McCampbell underwent an MRI at Cook County Hospital and his true diagnosis was known, he was treated with Prednisone. As of the date of his deposition (and well after he left Miami Correctional Facility), doctors

16

were still prescribing him Prednisone. The question isn't whether Nurse Practitioner Myers provided the best care possible or made an error of judgment; the question is whether she was deliberately indifferent to his medical needs. Thomas v. Blackard, 2 F.4th at 722; Hildreth v. Butler, 960 F.3d at 425–426. Based on this record, no reasonable jury could conclude that Nurse Practitioner Myers committed an Eighth Amendment violation in connection with his care.

### III. CONCLUSION

For these reasons, the court GRANTS the motion for summary judgment (ECF 50) and ENTERS judgment in favor of Defendants. The clerk is DIRECTED to close this case.

SO ORDERED on December 19, 2022

                                        s/ Robert L. Miller, Jr.
                                        JUDGE
                                        UNITED STATES DISTRICT COURT